May it please the court. Good morning. My name is Michael Burke and I represent the petitioner appellant Roger Scott. The sole certified issue before the court this morning is whether Mr. Scott was denied his Sixth Amendment right to the effective assistance of counsel at the penalty phase of his capital trial. Following a three day evidentiary hearing which was ordered by this court, the district court ruled that Mr. Scott was not entitled to relief on the claim. This panel now reviews that ruling de novo. The resolution of the issue involves a straightforward application of the two pronged test of Strickland v. Washington. Specifically one was trial counsel's performance deficient and two was Mr. Scott prejudiced as a result. This is a determination we have to make with what the Supreme Court has said was a double measure of deference. We first owe deference to the state cause determination and then we owe deference to the judgment of counsel in conducting the defense. Now, in this case, Judge, in this case, because In general, that's how they are reviewed. Yes, absolutely. In this case, we don't have double deference? No, Your Honor. And the reason for that is that the issue before the district court here in effective assistance of counsel at penalty phase was never adjudicated on the merits by the state court. It was found to be procedurally barred. So there was no merits determination. So in this case, the district court's resolution was a, itself, a de novo application of Strickland. So there is no double deference in this case. It seems a little odd that a claim is procedurally barred. There should be less deference in a case where, in a case where the Petitioner has actually exhausted his claims properly. It seems a little strange, doesn't it? No, Your Honor, because this Court's resolution creates an incentive to not exhaust, doesn't it? Well, no. This Court has previously found in its prior decision in this case that the district court was wrong in finding the claim procedurally barred, that it had, in fact, been properly presented in the state court, and so, therefore, it was a misapplication of Federal law to find a claim procedurally barred. So there would be no reason to punish. Well, if it was presented, then it must have been adjudicated. If it was presented, then it must have been adjudicated.  If it was presented, then it must have been adjudicated. It's a two-person ability. It was never presented in the state court, so they couldn't exercise any discretion. We don't know the reference. Or it was presented, which is what we held, and in that case, we don't need the state court to tell us what it did. The point is it was presented to the state court. The state court denied it. We have to presume that the state court adjudicated it on the merits and resolved it. No, Your Honor. I disagree. There's no such presumption in this case because the state court found the claim and this was litigated in the previous appeal in this case, and this court ruled that the state court had incorrectly concluded that the claim was not properly raised. There is no question in this case at all that Mr. Claim, Mr. Scott's claim of ineffective assistance of counsel on penalty phase of the trial was never adjudicated, never considered on the merits, and only when you have a merits determination by a state court do the deference provisions of 2254d1 come into play. So that is not this case at all. This case is a, as if it were a Federal trial in which a defendant was raising a Strickland claim. The district court would apply a de novo application of Strickland, and this court would review that ruling de novo, which is exactly where we are in this case. So that also ---- But we would still give a level of deference to the judgment of counsel. Absolutely, Your Honor. There is deference under Strickland, and it's progeny to the actions of counsel. We would submit in this case, though ---- Of course, to the extent that there's been a superseding of supreme court authority on our point, if we ruled it that the state court had to make explicitly a rule on the issue, that may have been superseded by intervening supreme court cases, in which case we're in a position to, in the middle of a scammy, to reconsider our ruling, no? Again, I disagree, Your Honor. There's clearly no issue in this case of whether the state court ever ---- reviewed this case, this issue on the merits. It never happened. And under established Ninth Circuit law, what would then happen is that the district court would review the claim de novo. Now, Judge Bail, you are correct. That district court would show some level of deference, obviously. Refresh my recollection. What was the independent state ground which the state trial court found precluded the IAC consideration? Let me give you some background. This was a case in which post-conviction counsel raised one claim in a three-page petition for post-conviction relief. That claim was a claim that the victim's father in the case wished mercy for our client. That ---- our client wrote a series of letters to the court asking for competent counsel to be appointed. Eventually, he said he fired his lawyer. And eventually, another lawyer stepped in. I'm sorry. This is at the post-conviction stage. State post-conviction stage, yes. And that second lawyer filed after this point. Let me go back a little bit. The state court had already ruled on that one claim. He had denied relief and on the merits. That had been a merits review. A second petition was filed raising multiple claims.  That was the amendment under 32D. Exactly, under 32.16. That was wrong. And that was the court held in the previous decision, that that was an incorrect ruling and that under Federal law the claim could be considered de novo. I don't believe you. So this is why we were back in the district court doing a de novo analysis of Strickland. The first question that we have to look at, then, is did trial counsel's performance was it deficient? Was it below a level of competency that it deprived Mr. Scott of effective assistance of counsel? What would the psychiatrist that you wish had been used, what would have been the purpose? The purpose was this, Your Honor. There were several records, medical records, school records, and other records that indicated that Mr. Scott had certain neurological deficits, that he might have brain damage. There were CT scans that preceded the crime in this case that showed that Mr. Scott had an atrophied frontal lobe. As Mr. Scott told his lawyer, I have brain shrinkage, is what he told his lawyer. If counsel had gotten any records about our client, and he never did. Let me take you past that point. Okay. Let's assume he had the psychiatrist who had said, yes, his brain has shrunk. And all the accidents that he said he had have damaged his brain and so forth and so on. Would that psychiatrist have had to conclude what in order for him to get the relief that you are asking us to give? Well, as a predicate, I would say it would not have been a psychiatrist because a psychiatrist was not a psychiatrist. It would have been a neuropsychologist first who would have conducted testing, which is what we did when we were appointed to the case in 2006. But what would they have introduced? And the reason I press that with you, the record says the facts demonstrated that he didn't need that psychiatrist. At least that's his opinion. That's the reason he didn't call him. So that's why I want you to tell us what the psychiatrist would have, what the expert, you tell me, not a psychiatrist. The expert, which would have, yes, the expert would have said that Mr. Scott has frontal lobe brain damage. That he, in addition to the actual atrophy of his brain, he has brain damage, which is to his frontal lobe, which as a result affects his ability to make judgments, to to understand the consequences of his actions. He has difficulty with problem solving. These are all these are all direct consequences. And that he's duped. He will do what somebody tells him. Exactly. I don't think he would have said that. Quite the contrary. What the brain damage theory would have suggested impulsivity, which was inconsistent with his conscious strategy to say this guy is duped. And this is not somebody who acted impulsively. This is somebody who acted to please other people. The duping theory is really quite, quite inconsistent. There's nothing you have at all that suggests that brain damage would have supported the duping theory. Well, I disagree, Your Honor. There's nothing to suggest that a person who has difficulty in judgment is not going to be easily duped by someone else. There's no inconsistency. Double negative doesn't help you any. Excuse me? Double negative doesn't help you any. There's nothing that doesn't show it doesn't help you any. What you have to do is have affirmative evidence. I didn't see anything. There is affirmative evidence that that brain damage, and it's from Dr. Brawley. He had two professionals. He had the psychologist, psychiatrist look into this. He said, look, we understand the client says it was brain shrinkage. They looked at the tests. They looked. They did tests. They looked at the results, and they said, no, there isn't. Under Leavitt, why isn't that the end of the matter? Under Summerlin, in the en banc decision in this Court's decision in Summerlin, it can't. Leavitt is more recent. But Summerlin has not been reversed, Your Honor. And Summerlin says that it is deficient performance for an attorney, and this was an attorney in 1982, eight years before this trial, to rely solely on the findings of a Rule 11 evaluation, which is what we had in this case. That was all that counsel ever requested. And, in fact ---- That's why I want you to tell us what the psychiatrist would have said. You see, there's no doubt he didn't get him. He didn't call him. But not the psychiatrist. What are you telling me it was? He was the expert. The expert. Not the expert. Right. The neurologist would have said what I was just saying. He would have said what? That he has brain damage. All right. But wouldn't he have to go further than that? Wouldn't he have to go to tell us what effect that would have had? Absolutely not, Your Honor. He wouldn't have to. It would make the mitigating evidence more persuasive. And I firmly believe that the record in this case shows that there is a link there, that under Eddings and Lockett, mitigation evidence covers the entire panoply. There does not need to be any linkage, any nexus between the mitigating evidence and the crime in the case. Pardon me, counsel. The mitigating evidence is admissible if there's no linkage. But that doesn't mean it's persuasive. Certainly not. If, for instance, they found that he had a broken ankle and they overlooked it, it would be mitigating evidence, but it wouldn't be persuasive as to the circumstances of the crime. Let me put this in the context of Arizona law at the time in 1990 when the sentencing occurred in 1991. The Arizona Supreme Court had made it clear in a decision called Walton that for mitigation in Arizona, the evidence of organic brain damage, which we have here, is compelling mitigation. There was no speaking of nexus. There was the fact of the brain damage was compelling mitigation, and in that same decision, the Court said evidence of personality disorders has never been found to be persuasive, never to tip the scale in favor of leniency. What we have in this case is a lawyer, never got any records. He didn't even know the effect of Mr. Scott's brain damage. Well, but this same lawyer had used Dr. Tetreault in a prior case and reduced the penalty from death to life imprisonment, right? Yes, but that has absolutely no significance, Your Honor. What that shows is that — By using personality disorder, not by using organic brain damage. No, it was by using organic brain damage. And so when he used Dr. Tetreault, who was the psychologist in that case, and that case is called Stewart, Dr. Tetreault — That's right, the boxer. Exactly. There may be evidence. And then Mr. Starley then got a neuropsychologist, and lo and behold, there was brain damage. So you see, there's a step that I think you're ignoring, and that's why I keep pressing you on it. And maybe it doesn't matter. And if it doesn't, you can make it clear to me. So he had a — as Judge Baird points out to you, let's say he had a broken ankle. So he had a shrunken brain. What is the effect of that? And wouldn't a psychiatrist have had to say some effect? In your view, no. Is that right? My view is that under Lockett and Eddings, that's something — there is an effect, and I'm not sure how to answer that. There is a — cognitive deficits result from organic brain damage to the frontal lobes. That's what the experts all agreed in this case. There's no question — Did any of your experts, either Brawley or Hyde, say that the shrunken brain, the cognitive deficits, the difficulty in making judgments had anything to do with the actions of this man in these circumstances, in this time? Yes. Dr. Hyde opined — Dr. Hyde said that likely the damage was there in 1989. No. Dr. Hyde testified that to a reasonable degree of medical certainty that the damage was there. He also opined on the stand and in his report, which are in the record, that this would have affected Mr. Scott's actions at the time. And how would it affect it? Because it would have made him more likely to cooperate in the crime? Yes. Did he say that? Well, I don't want to misstate the weapon. I'm not sure if he actually — I can check his exact testimony if the Court would like, but I believe what he said was because of the effects of the brain damage, because it affects his ability to understand the consequences of what he is doing, it affects his ability to make sound judgments. That would explain why he was involved with Mr. Stiers in this case. He simply lacked the capacity to make reasoned, qualified decisions. But you'd look at the record. You'd have to look at the record in order to evaluate the conclusion that you've just reached. And when you looked at the record, you would see that he was approached to participate in this murder, and he bargained the price up to the $250, which he finally agreed upon. Doesn't the record show that? No, that is not what the record shows. What does the record show? That is what statements have been made in the record. What does the record show? The record shows, Your Honor, that Mr. Scott, after being interrogated for 18 hours, made a statement in which he said that the Stiers and Wilkie originally offered him $150, and then they later offered him $250. There was absolutely no evidence of any negotiation on Mr. Scott's part at all. In other words, they just volunteered to raise it. He was willing to go along with $150. Yes. Is that what you're saying? There's – there's – that he was – I mean, you're turning that into an aggravating factor. We have to look at the record. In this case, it doesn't matter how much. It seems to me you're quibbling over the word bargain. If somebody says, I'll pay $150 to do something, and you say no, and then they come back and they say, will you do it for $250? And you say, yes, I think it's fair to suggest that that's bargaining. That's still not what the record – Excuse me? I'm sorry, Your Honor. That's still not the record. Why do you have to cut in while I'm talking? I listened to you. You've talked. Why is it necessary for you to cut in while somebody else is talking? It was – I apologize. You're prepared to listen and talk at the same time, distracting, and I lose my train of thought, and you're not going to find out what it is I really want an answer to. So you're really not doing your client a favor by doing that. Now, are you prepared to listen to the question? Yes. Okay. Will you think about it and give me a thoughtful answer rather than react? Yes. You're really not advancing your client's cause when you do that. I understand. You understand that? Yes. Now, if somebody says, I will offer you $150 to do something, and you say no, and then they come back and you say, will you do it at $250, and you say yes, why is that fair, as Judge Ferris suggested, to characterize that as bargaining?  Some people have a passive style of bargaining. Sometimes the best bargaining is to stand mute and have them come back with a better offer. You're a lawyer. You must know about stuff like that. So why is it not a fair characterization of the record, since we have to view the record in a light favorable to the jury's verdict? You may answer now. We are limited by — You can think about it. You don't have to answer. You can take a minute to think about it, but that's my question. I believe, Your Honor, that — It's not really a question of what you believe. Judge Ferris asked you a question about bargaining. Okay? And you categorically — you didn't let him get the word out of his mouth before you categorically disagreed with him, that, oh, there was no bargaining, this is what they say about it. You know, they basically accuse the State of lying about the record. And so I'm pinning you down on this. I would like to know why it is that you disagreed with Judge Ferris' entirely fair question about bargaining. Why isn't this a fair way of — why isn't this something that a jury looking at this evidence could say, you know, the guy was smart enough to bargain up the price for killing a 4-year-old boy? First, perhaps it would be useful if I actually read the exact language that has been relied on throughout the case. To do that, the record is always the best guide. And I'll tell you, Mr. Burke, the reason he wanted $250 was because that's what he needed to pay his lawyer to get his disability claim made again. He tried to get disability. He had made several efforts, and he didn't get it. And he needed $250 to pay his lawyer. So $150 wasn't going to cut it. He needed $250. And when he got the $250, at least the record as I read it — and that's why I want you to tell me why it's not so — $250 was the price, and he agreed upon it, and off he went. Those were — those were references that the prosecution made from the statement that Mr. Scott made. And reasonable inferences from a fact. Can't you draw reasonable inferences from the fact? And just to add to Justice Sessions' question, and aren't we required, we sitting here where we do an appeal from an habeas petition, aren't we required to draw whatever reasonable inferences the jury could have drawn? We don't have a choice but to do that. So if a reasonable jury could have drawn a reasonable inference of bargaining, don't we have to take it established as a fact that there was bargaining? Perhaps. Yes. No, no, you didn't. It is fine. And further, you're going to — your opponent's going to tell us all we had to do was ask the judge because the judge sentenced this person. We don't have to assume. We know — we can know what went through his mind because we can ask him. He was sentenced by a judge. Isn't that correct? Yes, Your Honor. At the time that Mr. Scott was sentenced, he was sentenced by a judge. All right. That has since been declared unconstitutional. And it's since changed. In subsequent cases. Yes. But it doesn't — it doesn't do your client very much good, does it? Excuse me. Your co-counsel has — if you wanted to read the record to this. This is actually quite a significant point because if he's out there bargaining, then, you know, that really sort of undermines sort of impulsivity theory or, you know, the ability — you know, the idea that he can't — doesn't have the wherewithal to, you know, the way that he — that he — the brain damage really played a factor in this. The doubt that this is going on. Please go ahead. The record is always the most important. This is what Mr. Scott said at 8 o'clock in the evening on December the 3rd after being interrogated for 18 hours. He said — And this was presented to the jury. And this was presented to the jury. Yes, it was. So another way of characterizing what you are saying is this is what the jury heard. Absolutely. Yes, this is what the jury heard. All right. Just so we — just so we got that straight. This is a statement from Mr. Scott. It was — and this is at ERR tab 35, page — 35? 35. And it's on page 10 of that exhibit. Okay. Beginning with line 8. This is the entirety of the evidence in the record. It was — at first it was 150. 150. And then it went — as it went on and they wanted to get rid of Chris all the more, it went up to 250. That is the sole evidence of negotiation on Mr. Scott's part. But perhaps — perhaps — Okay. You say it as if it were so little. To me, it sounds like it's even better than our questions have suggested. As it went on, they wanted to get rid of Chris all the more. It went up to 250. Why can't the jury look at that and say, well, they weren't really throwing in an extra hundred dollars for no reason at all. It's because there were negotiations going on, because he was actually reluctant. They really wanted to get rid of the kid, so they threw in an extra hundred bucks. Why can't the reasonable jury look at it and derive from that a view of your client as somebody who's pretty canny and, as Judge Ferris said, had a reason to want more money and — I mean, a specific sum of $250. And so he held out for it. And why isn't that show bargaining? You remember what we're talking about. We're talking about money paid for killing a child. And why wouldn't the jury be horrified by that? Couldn't they say, you know, this is somebody who has a wherewithal to plan and a wherewithal to commit a murder for hire? That certainly would be an inference they could make. It would not be unreasonable, Your Honor. But let me — let me state this. I don't know. I'm reading it. And this is what it sounds like to me. Maybe I'm unreasonable, but — No, I said I don't believe it would be unreasonable. Oh, you don't think it would be unreasonable. I'm sorry. I'm sorry. In this case, the sentencer, the judge, found an aggregator of pecuniary gain. He found that Mr. Scott engaged in this act for money. So we're — that is already in the record that the judge found that. The focus then is when this Court does its own independent de novo reweighing of evidence that was not presented to him, and it's considerable evidence in addition to this one factor that we've been focusing on. It's evidence of the fact that Mr. Scott — well, there's a few things. This Court noted in its prior decision that the fact that there had been a plea agreement offered to Mr. Scott for second-degree murder was mitigating evidence. The trial — the district court found that the Court was aware of that. Again, there's nothing in the record to suggest that the trial court was aware of that because the Court — there were two separate judges who heard this case. The plea offer was during a time when one judge was on, and the sentencing judge was a different judge, and there was no argument about the plea at sentencing. Another factor not considered by the Court at sentencing or in appeal was the fact that Mr. Scott was a severe alcoholic. That was — that was — that was mentioned by the Court that concluded they couldn't even consider that factor because there was no nexus to the crime. We have — we have evidence as we — of seizures. There was evidence never presented to the Court of seizures that Mr. Scott, in fact, was hospitalized with broken bones to the face after he collapsed in a grand mal seizure on the street. So further evidence of possible head injury as well. So there's — What does — how does that — any of that help your ineffective assistance counsel claim? I mean, we're back to the broken ankle. So he had seizures. I mean, lots of people have seizures and don't go around committing murders. There's no evidence at all here that seizures have anything to do with their name mitigating. I mean, we went over that in — in Cullen, the pinholster, right? That's the step that we want you to take. And the reason you want to take it is because you need to assist your client. And you can say these things, that's broken. He did. The record shows it. The bones in his face were broken. But so you've got to take us to the next step. So that means — The next — the next step would be does the fact that all of this evidence is there, does it for this Court undermine your confidence at all that Mr. Scott would have been sentenced to death if the State court, the trial judge, had been aware of the entirety of the information? That is what Strickland requires. You see, what the Court was well aware of, and that's — you don't want to get away from that. They were well aware of the fact that here was a person clever enough to discuss fee. Now, whether you say he bargained or whatever you want to say, he had a price. And the record shows, and so that we have to know the Court knew, not only did he have a price, he had a reason for wanting that price. Somebody will talk about it in one of the briefs, well, he hadn't worked for so many years. And he hadn't. But the reason he hadn't worked was because he was claiming he was disabled. Isn't that what the record shows? Yes, Your Honor. And he wanted to now have another go at that. And he had to get a lawyer to do it. And the lawyer was going to charge him $250. And that's what he had to have. So when we look at that, how do we make that favor your client? Your Honor, if that is the inference that you take from it — I'm not taking inferences. There's no inference I'm taking there. I'm talking about what the record affirmatively shows. Now, you tell me that it doesn't, then I'll listen. Well, that's where we disagree. I think that the record shows. If I come to you, Judge, and say, will you help me rob this person down the road and I'll pay you $150? Fair of you. And you say nothing in response. And I come back, how about $250? You haven't negotiated with me, but this is inference that we can draw. And I'm not going to tell you — You're going to accept it's not a negotiating tactic? The testimony, the evidence — You've done it. I mean, I don't know if it's a fact, but every lawyer's done it. You just say, well, you know, we're not going to respond to it. We're going to sit back and see if they come up with something better. I don't know a lawyer in the world who's practiced any amount of time, I mean, you know, who hasn't engaged in that tactic. I mean, it's the most common thing in the world to say I'm going to stonewall and hope to get a better deal. I think, though, that we're focusing on that factor, but we're overlooking the fact that the Court found that. It found pecuniary gain. So it — Well, it's not the question of pecuniary gain. The question is, is this somebody who is wildly out of control or completely duped or incapable, you know, which would have been the mitigating factor, or is somebody that's canny enough to bargain about the price he's going to get for killing somebody? Not the fact that there's gain. Gain, you know, it would be $150 or $250 or $5,000. It would all be gain. But the fact that he holds out for more and he has the ability to do that, that suggests that he was okay in the head and you don't get an extra mitigation for saying, oh, well, this guy's just so brain damaged that he can't be charged with full culpability for his actions. That's where the bargaining really, you know, sort of hurts your client. Right. You only have a few seconds, but I'd like to ask a question which will extend your time. Were you to get a reversal of the district court's denial of your writ of habeas corpus and were we to order that a further sentencing should take place? Do you have a position as to whether that sentencing would take place before a single trial judge? Or would there be a requirement that there be a jury trial as to the death penalty in Arizona today? The way that the track record has been is that if a case is reversed in habeas and sent back for resentencing, the new sentencing procedures are followed. So if this court were to- As a matter of Arizona law, but as a matter of constitutional requirement, would we be required to send it back for a jury trial or would a trial by a judge be sufficient constitutionally? Maybe you haven't thought about that. Well, the question is where does Ringo fit in? And Ringo only applies to aggravating factors. And so there's not a question here of the aggravating factors. So conceivably, Your Honor, I have not thought of that. All right. Perfectly okay. Thank you. Use your time. We'll give you a minute or two for rebuttal. We'll now hear from the state or the warden, rather. May it please the court, counsel. Suzanne Blomo, assistant attorney general. Did you point that microphone in your- I'm tall. Yeah. I wasn't going to say that. I don't know if it's going to go quite high enough, but I'll do my best. You know, I have the sort of same issue when I stand before a mic, so I usually have to point them down. So please go. I'm sorry. You were stating your name. Suzanne Blomo, assistant attorney general, representing Respondents Appley in this matter. Directing my attention to some of the Court's comments, I think that some of the Court's comments are very well taken. Regarding the $250, Judge Ferris is correct. That was a specific sum that the defendant needed so he could dispute a denial of Social Security benefits. And so he was seeking that amount, and he originally was $150, and as they pointed out in Exhibit 35, the more Stiers and Mielke wanted to, in Scott's words, get rid of Christopher, the price went up to $250. Where is the record citation to his need of $250 for his lawyer? I know that he told Dr. Don, so it would be in Dr. Don's report, that he was disputing the Social Security benefits denial. And I believe he said $250 there. I'm not entirely certain, but I know I pointed that out in the brief and I did cite the location. The brief, not the record. I understand, but I think I cited to the record in the brief. Okay. The other thing that's important to note is his disability had nothing to do with brain damage or shrinkage. His disabilities. If you don't know an answer to a record citation and you are not able to find it before you leave, you will send us a 28-J letter. So if you can ask any questions, like I just asked for a record citation, just put it in the letter in the next two days or so. Yes, Your Honor. Thank you. I'll do that. The disabilities were bad back, asthma, arthritis, and anxiety. Again, nothing to do with brain damage or brain shrinkage or anything of that nature. Turning to Dr. Hyde's testimony at the district court evidentiary hearing, he did not specifically link his opinion, and it's only his opinion, of the four doctors who testified. He is the only one who has opined that these cognitive deficits that exist presently were present 20 years ago at the time of the crime. And he did not specifically link them to Scott's susceptibility to manipulation by Stier's co-defendant. No expert to date has made that link between brain damage and susceptibility to manipulation. The only expert who ever made that link was Dr. Tatro. And Dr. Tatro made that link between the personality disorder, the aggressive personality disorder, or sorry, passive aggressive personality disorder. And he linked that to Scott's susceptibility to manipulation by Stier's. Roland Steinle pursued this mitigation because it gave him the opportunity to not only argue that he was duped into this, but he gave him the opportunity to highlight his lesser participation in the crime, and it gave him the opportunity to to basically demonize Stier's in his arguments. Well, let's go back to the first step, which is one of in strict and deficient performance. Yes. The record is pretty clear here that Mr. Steinle, now Judge Steinle, did not do any investigation as to the brain damage. Claim of Mr. Scott, which he Scott told him about. A. I had brain shrinkage. B. I've had four closed head injuries, losing consciousness. He did no investigation whatsoever as to the records. Don't we have cases in the Ninth Circuit and in the Supreme Court to say that a reasonable attorney cannot make the choice to follow the personality disorder? He's a dupe mitigation until he's fully investigated the other channel of metal relevant evidence, which is organic brain damage, which results in compulsive behavior or lack of judgment. He did none of that. He did no investigation. He was very honest about that. Isn't that by itself deficient performance under our cases like Corral and Wiggins? Your points were taken, Your Honor, but I have to respectfully disagree that he made no investigation. He did at some point decide and he decided he got medical releases. He could have obtained the medical records. He made the decision not to further pursue that. What led up to that decision was his client had said I've had head injuries. He didn't specifically say four, but I've had injuries that caused me brain shrinkage and memory problems. He at that time pursued that. He followed up on it. He didn't ignore it. He asked for a rule 11 evaluation. And it's important to know that it wasn't just a competency evaluation. It was also to evaluate the defendant's mental status at the time of the crime. Well, yes, but he was asking for an examination as to whether the man was mentally incompetent to commit the crime. McNaughton rule. And he was asking whether he was able to stand trial. That was Tito and Don's pretrial examination of 11. But he didn't do any investigation as to the third phase, which was mitigation for sentencing purposes at all. Now, I think don't you concede that Mr. Steinle was guilty of deficient performance in failure to investigate the organic brain damage? It may not be relevant. It may not be prejudicial. But as to the first step of Strickland, do you see any basis for saying that there was no deficient performance in failure to investigate? Your Honor, I don't concede deficient performance, although I will concede that I think this case is much more easily disposed of because they have so clearly failed to establish prejudice. But I don't concede deficient performance for several reasons. First, he followed up on the information when he went to get this evaluation. He got the court to bypass what's called a rule 11 prescreen and go straight to the full evaluation, which spared him getting possibly a not very helpful report. He also stipulated with the prosecutor about what experts they would get. They didn't just leave it up to the court to pick off a random list of court-appointed experts. They stipulated. He chose Dr. Tetrault specifically because he had worked with Dr. Tetrault before, and he knew Dr. Tetrault would offer a thorough report. He had worked with Dr. Tetrault in the Jimmy Stewart case, which was a case in which Dr. Tetrault, through a similar evaluation where he used similar testing methods, specifically the Bender visual motor gestalt test, that Dr. Tetrault had evaluated Jimmy Stewart and had found the existence of cognitive deficiencies. And based on Dr. Tetrault's findings, Roland Steinle then pursued neuropsychological testing and obtained the later records that showed that Jimmy Stewart had been a boxer and had frontal lobe damage. Dr. Tetrault used the same test in this case. He did not make that finding. But he didn't find any. But unlike Stewart, neither Tetrault nor Steinle went after the medical records. That's correct. He did not go. Steinle made the choice to basically end that line of investigation when he got Tetrault's report, when he got the opinion of personality disorders. But he did all that without finding out that medical records, including the two CAT scans in 87 and 88, which showed an atrophied brain. So that's true. Wouldn't have that. Those are clearly relevant to the issue, aren't they, as to whether there's brain damage or not. Well, I'll direct my comments to the medical records then. The medical records are simply not very compelling evidence. And this may go more to the prejudice prong. How would he know that if he didn't get them? I'm talking about investigation, not weighing, evaluation and use. Investigation. And that's why I was saying it may be more relevant to the prejudice prong than to the deficient performance prong. So you want to talk about the prejudice prong. You don't want to talk about the solution. I'm happy to talk about the deficient performance prong, but I don't think I'm getting anywhere with you, Judge. I hear you're conceding something implicitly, which I'm not sure. I mean, if you want to, that's fine. But are you conceding that it is counsel's job to obtain medical records if you hire an expert who can? Let me finish the question. Yes, Your Honor. You know, why do lawyers do this? You're already with an answer. You sit there and you open your mouth to answer my question without knowing where I'm going. You're going to get it wrong sometimes, okay? So just listen to what I'm asking. The lawyer hires an expert. And why isn't the or is the lawyer not entitled to rely on the expert's decision as to what medical records to obtain in order to make an informed decision diagnosis? I think there is no per se requirement for a lawyer to obtain medical records in any given case. It depends on the facts and circumstances of the case. So, yes, the lawyer — Wait a minute. I'm pointing to Levitt. Doesn't Levitt suggest otherwise? I think that's correct, Your Honor. And I did not cite Levitt in my brief, and I should have. It was a well-written decision, wasn't it? It was a very well-written decision, Your Honor.         I don't. I don't. I don't. I don't. I don't. I don't. And in Levitt is a case like this where there was a CT scan as well. And so it's on point there as well. But I think lawyers make reasonable decisions based on the information they get from their experts. Let me pursue, if I may, just go back one step and pursue the question I asked the opposing counsel on the level of deference, or single deference or double deference. And you may not think it matters in this case that you like to win either way or you think you should win either way, but it may matter. And double deference sounds like it's sort of overkill, but, in fact, the Supreme Court has told us that when the state court adjudicates an issue, we owe an additional measure of deference on this point. What is your position in terms of the deference, if any, that we owe? We understand we owe deference to the lawyer. We all agree on that, even opposing counsel. Do we owe any deference at all to the state court? Your Honor, I would love to have double deference in this case. Unfortunately, I find myself agreeing with Mr. Burke. Because there was no merits decision in state court, I don't think there is a state court decision to which this court gives deference. We have deference owed to the lawyer, and in this case it was really the district court really sort of acting in the stead of the state PCR court to make the determination in the first instance of whether there was ineffective assistance of counsel. And I think this court, while it can review de novo, the factual findings of the district court are reviewed, I believe, for clear error. And I don't believe that any of those findings were clearly erroneous. I find that just a little odd, because there are two ways about it. And maybe you can just walk me through it. I may just not be understanding something about this record. Either a matter is not presented to the state court, in which case it's not exhausted in order to show cause and prejudice and all those things to overcome lack of exhaustion, or something is presented to the state court, in which case I thought we owe deference. And the state court doesn't need to actually say something on the issue. The fact that it was presented and denied, I thought, and relief was denied, is enough for us to infer that they considered the issue and made a decision to which we owe deference. I thought that was sort of the syllabus. There's no way in between. You either fall on one side of the line. You didn't present it, in which case you have lack of exhaustion. Or you did present it, in which case you have an implicit state court decision, if nothing else, and we owe deference to that. Am I wrong about that? Is there some in-between case that's false? You're not wrong about that. I don't know that this is an in-between case, but it is a very unique circumstance in which the state court did not actually didn't deny the merits of the claim because it never addressed the merits of the claim. But it denied relief. And when it denies relief, I mean, if you raise three grounds for relief and the court says no, then it has denied every one of those grounds, whether it explains the reasons or says it thought about it or not. I thought that was the bottom line. When you present an issue to a court, the court says no. Why isn't that a denial? I am — let me — what exactly happened in the state court here on this issue? How did it play out? What happened here is the original post-conviction relief attorney filed a petition alleging one claim, which is the recommendation for leniency by the victim's father. It was denied. Another attorney then came in and filed a motion to — a motion for leave to file an amended PCR petition. And attached to that motion, she attached the petition she would file if the court gave her leave. The court did not give her leave to file the motion, but the court didn't say I don't find good cause under the rules not to give you leave to file the motion. The court said I don't have the authority to allow you to file the amended petition. So the claim made was that the claims attached to her motion for leave to file were presented to the court. The problem is the court never addressed them, made a finding on them, just said I'm not going to allow you to file this motion, but yet — and that was what was argued before this court, I guess it's been two years ago now, whether that was inappropriate, whether that resulted in those claims being procedurally defaulted or procedurally barred in habeas. But what I'm getting at is there's been a lot of law intervening years, and I'm just wondering whether our ruling there is still good law. The one area where — that I thought presented a bit of an interesting issue, but I felt like this court had remanded it for an evidentiary hearing, and so the district court held the evidentiary hearing, and we have to live with that now. But I think Colin v. Penholster is a bit interesting on this issue, because when the second attorney in PCR court filed her motion for leave, and she attached the PCR petition she would file, she didn't attach to it any affidavits, any facts, any declarations, which normally would be done in a PCR petition. So there were no facts presented to the court. Now, this court has held that the claims were presented, but I think that there could be a question about, because there was no presentation of the facts under Colin, whether they should be allowed then to come in with the facts in district court. The state court said we're not going to look at those facts anyway. That's true. And that could be — There could be no amendment, so regardless of what your allegations are, we're not going to take cognizance of your allegations, much less of any facts supporting them. That's very true, and that certainly could be seen as cause and prejudice for not presenting the facts in state court. So it leaves us where we are. I mean, I wish I could cite to a case that could undo what was done, but I'm here really to address — You're not going to go claiming otherwise in a cert petition, are you? I don't think so, although we have reserved our right to allege that the original decision — Well, I understand. I mean, that's the problem. I mean, to the extent our earlier ruling has been superseded by law, or maybe it was wrong to begin with, I mean, a lot of law has passed under the bridge in the intervening two years. I'm just wondering whether — what we're saying with that. So I guess you are reserving your right to petition to settle that issue, if you will say. Well, I — No, no, it's fine. But you didn't make a motion for a rehearing and back to our earlier decision. And our earlier decision said that we remanded for trial counsel on the issue of whether of Scott's traumatic brain injuries and their effect on his mental processes during the sentencing phase. Now, if that was a wrong remand because the issue had not been exhausted in the state PCR proceedings, there's an issue which could have been raised and you didn't. That's correct. Well, I don't want to move you away from answering the questions that you've been asked, but you mentioned leniency and the other side mentioned leniency. Wouldn't competent counsel have reason not to talk about the father's request? I think in this case, Mr. Steinle was aware of the Arizona law that precluded the trial court judge from considering a request either for a death sentence or for leniency from members of the victim's family. Plus, he would have had to — in addition to that, the only way he could have brought forth the father's request was by making it perfectly clear that three people — of the three people who have been charged, two have already been sentenced to death because that's what the father's concern was. How many people have to die because of my son? Isn't that what the record shows? Yeah, he made a comment about him feeling like he had blood on his hands. And the reason was because two people had already been sentenced to death. I think that's correct. And I think his testimony at the evidentiary hearing in district court also had to do with his own feelings. He said two heads for two hearts, his heart and the heart of the child. But the third person should get a consecutive sentence. Yes. I think that was his — The third person was Scott. Yes, I think that was his recommendation. But I think his recommendation had a large part to do with his own feelings. As opposed to just the facts and circumstances of this crime or of Scott. Granted, Scott did, however, lead police to Christopher's body. But that, of course, was more mitigation that Steinle argued that the trial court should have considered in giving him leniency. I'll just briefly go back to the personality disorders mitigation versus brain damage mitigation because I think it's important and I think pursuing that strategy was what caused Roland Steinle to end his investigation, and I would argue reasonably, into brain damage mitigation. The personality disorder mitigation, the trial court, the sentencing judge, specifically found to be mitigating. And what's more, as I mentioned before, that type of mitigation Steinle was able to tie into his other mitigation, which was essentially a picture of this guy may be a bit of a nerd and well, but he's essentially a decent guy. He has no prior felony convictions. He has this bond of love with his mother. And this incident was aberrational because of his personality disorders and because of his relationship with Stiers. He was not able really to make that same argument with a brain damage or frontal. How would it have hurt? Do you think that there was a reasonable strategy in eliminating mitigating damage based on organic brain damage? Because it would lessen the impact of his argument regarding personality disorder. You know, I'm sure that some people would say he should just throw it all out there and see what sticks. But I think part of lawyering is deciding what arguments to focus on and what arguments to not put as much focus on. On the basis that the judge might find the second argument dilutes the force of the first argument. It could or could displace it or it could be inconsistent. Steinle testified he wanted to maintain a consistent theory through both the guilt phase and through the penalty phase. Sometimes lawyers lose some credibility if they put forth a theory at the guilt phase and then they get to the sentencing phase and say, well, that didn't work. I've got another one for you. I mean, so he's risking losing his credibility before the Court as well. If the Court doesn't have any more questions, we'll stand on our brief. You're going to cede your time to opposing counsel? No, I'm not going to cede my 7 minutes and 39 seconds to opposing counsel. I think the Court's already going to be giving him some more time. Thank you. There will be no further questions. We'll give opposing counsel at least two of those minutes. I'd like to very briefly address a few points that were made during the State's argument. Excuse me. Chief Judge Kuczynski, you mentioned when you were discussing trial counsel in this case, counsel having hired an expert. Mr. Steinle never hired an expert in this case. He asked that the Court appoint a Rule 11 expert to just simply determine competency and Mr. Scott's mental state at the time of the crime. He never hired an independent expert at all to review anything, and he never obtained any records to give to the Rule 11 doctor. So that limits that. But I mean, I guess I use the word hired perhaps loosely. And let me just sort of change the characterization. Maybe it makes a difference. But why isn't sort of consulting an expert, relying on the determinations of an expert enough? Or is that different from hiring an expert? In Summerlin, this Court said that it's not enough to rely on a competency expert because their reason for evaluating the client is very different. But this was more than a competency determination. No, it was not, Your Honor. In fact, when Mr. Steinle appeared before the Court, he only asked for a prescreening. And the judge, not Mr. Steinle, said, why don't we just do a full Rule 11 screening? That's all that was ever accomplished by Dr. Tedro and Dr. Don. So there was never an opportunity. It doesn't matter that he gave a reason for doing what he did, and we see what the reason was when we look at the records? I'm not sure what you mean by he gave a reason for not hiring an expert. He said the facts of this case are such that I felt we didn't need an expert. Didn't he say that? He did, Your Honor. But I believe that under Wiggins and under Williams v. Taylor, that I'm over. May I finish? No, no, no. Yes, you may finish. But the only point I'm making is he made a judgment call. But a judgment call is only reasonable to the extent that it's based on adequate investigation, and he did not do an adequate investigation in this case. Thank you. Did you have a full answer? Don't worry about the clock. I'm not trying to get you to extend the argument, but there was certainly more you wanted to say on that point. Don't let the clock scare you. May I, with the Court's leave, respond to one point about Mr. Milton? Obviously, if it's a response to the judge's question, you must stay there and answer. Your Honor, you mentioned Mr. Milton's request for mercy in this case, and the State responded that it had – it would have been inadmissible. But the Arizona law at the time required evidence from a victim seeking leniency for a defendant if it went to the circumstances of the crime. And in this case, Mr. Milkey told the pre-sentence report writer, and this is what would have alluded Mr. Steinle, is that if Mr. Scott had not confessed, if he had not led the police to his child's body, if he had not shown them where the weapon had been thrown, if he had not – or where the weapon was hidden, where the shoes had been hidden, that the case might not have been solved. So that was one of his motivating factors. It would have been admissible under Arizona law. You know what the problem with that? And that's what I'm wondering about. He – his defense was that he's easily led, that he's a dupe, that he does this. He was given those shoes and the body garments with instruction to destroy them. He didn't destroy them. So he'd be in a little bit of a difficulty to say, I'm duped, I do what everybody tells me to do, when it was clearly in his best interest to do what he was told, and he didn't. He elected not to destroy them. That's how he had the evidence to come forward. Now, isn't that what the record shows? The record shows that Mr. Stiers placed the gun in Mr. Scott's pocket, or his belt, and then gave him the shoes and told him to get rid of it. Yes. Dr. Hyde testified at the hearing that, in fact, the fact that Mr. Scott was unable to even follow those directions was indicative of brain damage. The fact that he just dropped them in a parking lot where people were coming and going, it shows that he wasn't able to think through his actions. And so I don't see the evidence to support that. It takes a lot for a favorable spin on it, and you're doing it, I guess. But what he – it's hard to say that here's somebody who just does what he's told, is just not very – his brain's not right, and then we see things that he didn't do. For instance, he was offered the opportunity to plead to second degree, wasn't he? Yes, he was, Your Honor. And he was urged by his own counsel to accept that offer, wasn't he? The record indicates that he was urged to accept it, yes. And the prosecutor was offering it. His lawyer said, take it. And he, exercising his independent judgment, decided, I won't do it. I'm not going to accept it. Actually, what he told his lawyer, and this is in the record, is that I'll do what you want me to do. Just tell me what you want me to do and I'll do it. It may not be true, but I will do it. And the lawyer told him to read the agreement. He said, I won't read it. He says, I won't. I can't. And he had to sign it. Right. There's no indication that Mr. Scott is unable to read or doesn't understand English language. No. No. But even Dr. Tatro, if I may respond to that, Dr. Tatro, who was the Rule 11 doctor, said when placed under pressure and told to perform, he is unable to perform. He shuts down. And that is the doctor that Dr. — that Mr. Steinle relied on. So, thank you. The fact that time passed, you see, that's for the right now. But he had time to consider. This wasn't something he had to do at the moment, was it? That wasn't the testimony that Mr. Steinle gave. That was the record, Joe. He was given the shoes, wasn't he? Oh, I'm sorry. I thought you were speaking about the plea. No, that's fine. You were saying pressure and he made a decision. But he had time in this case, I think. Didn't he? With regard to the shoes? Yes. Presumably he could have, but he didn't do what he was asked to do. Yes. Okay. Thank you. We are in recess. We will reconvene with the reconstitutive panel at 1115. 1115. Thank you. All rise.
judges: Kozinski, Farris, Bea